1

2

3

4

5

6

7

8                      IN THE UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA,

10   NOEL PHILLIPE SCOTT,

11                  Petitioner,              No. CIV S-09-2830 JAM GGH P

12        vs.

13   JOHN W. HAVILAND, Warden,

14                  Respondent.              FINDINGS AND RECOMMENDATIONS

15   _____/

16   Introduction

17              Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas

18   corpus pursuant to 28 U.S.C. § 2254.  Petitioner challenges the 2007 decision by the California

19   Board of Parole Hearings (BPH) finding him unsuitable for parole at his initial parole

20   consideration hearing.  Petitioner, in 1990, was convicted of first degree murder with a firearm

21   use enhancement, for which he was sentenced to a term of 25 years plus an additional two years

22   for use of a firearm for a total of 27 years to life.  Petitioner raises eight grounds to challenge the

23   BPH decision denying parole: 1) bias of BPH "readily apparent from the record" violated

24   petitioner's constitutional right to due process and equal protection; 2) "no adequate or even

25   legitimate support in the record" for BPH denial in violation of petitioner's constitutional right to

26   due process and equal protection; 3) BPH's "pretextual assertion that petitioner has not yet been

                                             1

1  adequately rehabilitated violates state law establishing the purpose of incarceration"; 4) BPH

2  violated state law in failing "to set a primary term is - a duty mandated by state law that is

3  entirely separate from its task of determining current parole suitability"; 5) petitioner's due

4  process and equal protection rights were violated because BPH followed a "no parole" policy and

5  decision must be vacated; 6) because petitioner has passed the "Minimum Expected [sic] Parole

6  Date," "the state's present custody of petitioner is unlawful"; 7) Linda Shelton, the presiding

7  commissioner of petitioner's BPH panel, was fired for bias; 8) state courts' decisions [habeas

8  petition denials] were "'contrary to, or involved an unreasonable application of, clearly

9  established federal law, as determined by the Supreme Court," and "were based on an

10 unreasonable determination of the facts."   Petition, pp. 7-8.

11             On February 4, 2011, petitioner's motion for an extension of time to file a traverse

12 was denied as moot and both parties were ordered to provide supplemental briefing regarding the

13 recent United States Supreme Court decision that found that the Ninth Circuit erred in

14 commanding a federal review of the state's application of state law in applying the "some

15 evidence" standard in the parole eligibility habeas context.  Swarthout v. Cooke, ___ U.S. ___,

16 131 S. Ct. 859, 861 (2011).[1]  Petitioner's motion for an extension of time to file a  supplemental

17 brief was granted, by order filed on February 24, 2011.

18 AEDPA

19             The statutory limitations of federal courts' power to issue habeas corpus relief for

20 persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and

21 Effective Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

22             An application for a writ of habeas corpus on behalf of a person in
               custody pursuant to the judgment of a State court shall not be
23             granted with respect to any claim that was adjudicated on the
               merits in State court proceedings unless the adjudication of the
24

25 _____

26       [1] The earlier citation in the prior order was to Swarthout v. Cooke, [___] U.S. ___, ___ S.
   Ct. ___, 2011 WL 197627 *2 (Jan. 24, 2011)

2

1    claim-

2          (1) resulted in a decision that was contrary to, or
            involved an unreasonable application of, clearly
3          established Federal law, as determined by the
            Supreme Court of the United States; or
4

5          (2) resulted in a decision that was based on an
            unreasonable determination of the facts in light of
6          the evidence presented in the State court
            proceeding.
7

8          As a preliminary matter, the Supreme Court has recently held and reconfirmed

9    "that § 2254(d) does not require a state court to give reasons before its decision can be deemed to

10   have been 'adjudicated on the merits.'"  Harrington v. Richter, 131 S.Ct. 770, 785 (2011).

11   Rather, "when a federal claim has been presented to a state court and the state court has denied

12   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

13   of any indication or state-law procedural principles to the contrary."  Id. at 784-785, citing Harris

14   v. Reed, 489 U.S. 255, 265, 109 S.Ct. 1038 (1989) (presumption of a merits determination when

15   it is unclear whether a decision appearing to rest on federal grounds was decided on another

16   basis).  "The presumption may be overcome when there is reason to think some other explanation

17   for the state court's decision is more likely."  Id. at 785.

18         The Supreme Court has set forth the operative standard for federal habeas review

19   of state court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an

20   unreasonable application of federal law is different from an incorrect application of federal

21   law.'"  Harrington, supra, 131 S.Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410, 120

22   S.Ct. 1495 (2000).  "A state court's determination that a claim lacks merit precludes federal

23   habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's

24   decision."  Id. at 786, citing Yarborough v. Alvarado, 541 U.S. 652, 664, 124 S.Ct. 2140 (2004).

25   Accordingly, "a habeas court must determine what arguments or theories supported or . . could

26   have supported[] the state court's decision; and then it must ask whether it is possible fairminded

                                        3

1   jurists could disagree that those arguments or theories are inconsistent with the holding in a prior

2   decision of this Court." Id. "Evaluating whether a rule application was unreasonable requires

3   considering the rule's specificity.  The more general the rule, the more leeway courts have in

4   reaching outcomes in case-by-case determinations.'" Id.  Emphasizing the stringency of this

5   standard, which "stops short of imposing a complete bar of federal court relitigation of claims

6   already rejected in state court proceedings[,]" the Supreme Court has cautioned that "even a

7   strong case for relief does not mean the state court's contrary conclusion was unreasonable." Id.,

8   citing Lockyer v. Andrade, 538 U.S. 63, 75, 123 S.Ct. 1166 (2003).

9           The undersigned also finds that the same deference is paid to the factual

10  determinations of state courts.  Under § 2254(d)(2), factual findings of the state courts are

11  presumed to be correct subject only to a review of the record which demonstrates that the factual

12  finding(s) "resulted in a decision that was based on an unreasonable determination of the facts in

13  light of the evidence presented in the state court proceeding."  It makes no sense to interpret

14  "unreasonable" in § 2254(d)(2) in a manner different from that same word as it appears in

15  § 2254(d)(1) – i.e., the factual error must be so apparent that "fairminded jurists" examining the

16  same record could not abide by the state court factual determination.  A petitioner must show

17  clearly and convincingly that the factual determination is unreasonable.  See Rice v. Collins, 546

18  U.S. 333, 338, 126 S.Ct. 969, 974 (2006).

19          The habeas corpus petitioner bears the burden of demonstrating the objectively

20  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

21  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).  Specifically, the petitioner "must

22  show that the state court's ruling on the claim being presented in federal court was so lacking in

23  justification that there was an error well understood and comprehended in existing law beyond

24  any possibility for fairminded disagreement." Harrington, supra, 131 S.Ct. at 786-787.  "Clearly

25  established" law is law that has been "squarely addressed" by the United States Supreme Court.

26  Wright v. Van Patten, 552 U.S. 120, 125, 128 S.Ct. 743, 746 (2008).  Thus, extrapolations of

4

settled law to unique situations will not qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76, 127 S.Ct. 649, 653-54 (2006) (established law not permitting state sponsored practices to inject bias into a criminal proceeding by compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards does not qualify as clearly established law when spectators' conduct is the alleged cause of bias injection).  The established Supreme Court authority reviewed must be a pronouncement on constitutional principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9, 123 S. Ct. 362, 366 (2002).

The state courts need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8, 123 S.Ct. at 365.  Where the state courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal court will independently review the record in adjudication of that issue.  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

Finally, if the state courts have not adjudicated the merits of the federal issue, no AEDPA deference is given; the issue is reviewed de novo under general principles of federal law. James v. Ryan, __ F.3d __, 2012 WL 639292 *18-19 (9th Cir. 2012).

Argument & Analysis

Because many of the claims can be more efficiently addressed if the court begins by considering the second claim first, the undersigned will begin with claim 2, then move to claims 3, 4, and 6, after which claims 1, 5 and 7 will be addressed, finally ending with claim 8.

\\\\\

\\\\\

\\\\\

\\\\\

1        "Some Evidence" Claim – Claim 2

2        In claim 2, petitioner argues that there was no legitimate support in the record for

3  BPH's parole suitability denial.[2]  Petition, pp. 7-8, 21-36.[3]  Claim 2 includes the following

4  subclaims: that the  U.S. Constitution applies a more stringent standard of review in a parole

5  denial than does California's "some evidence" standard; that the BPH unsuitability finding was

6  not supported by "some evidence" in the record or by the required preponderance of the evidence

7  standard; that the BPH assertion that the crime was "especially cruel and callous" lacks adequate

8  support; that there is not a legitimate nexus between petitioner's prison disciplinary history and

9  the BPH finding of parole unsuitability and that the BPH improperly relied on the unchanging

10  circumstances of the commitment offense in denying parole.  Petition, pp. 7-8, 21-36.

11        The parties timely filed supplemental briefing, but as was set forth in the earlier

12  order (docket # 34), and notwithstanding petitioner's argument, there appears to be no federal

13  due process requirement for a "some evidence" review.  Quoting, inter alia, Estelle v. McGuire,

14  502 U.S. 62, 67 (1991), the Supreme Court recently re-affirmed that "'federal habeas corpus

15  relief does not lie for errors of state law.'"  Swarthout v. Cooke, ___ U.S. ___, 131 S. Ct. at 861.

16   Id.  While the high court found that the Ninth Circuit's holding that California law does create a

17  liberty interest in parole was "a reasonable application of our cases" (while explicitly not

18  reviewing that holding),[4] the Supreme Court stated:

19
   _____

20        [2] Although petitioner alleges on this ground that both his constitutional right to due
   process and to equal protection were violated, he does not demonstrate how he believes equal

21  protection was implicated.

22        [3] Page numbers referenced are those of the court's electronic docketing system.

23        [4] While not specifically overruling Hayward v. Marshall, 603 F.3d 546 (9th Cir. 2010) (en
   banc), the Supreme Court instead referenced Pearson v. Muntz, 606 F.3d 606 (9th Cir. 2010),

24  which further explained Hayward.  Thus, the Supreme Court's decision in Swarthout, essentially
   overruled the general premise of Hayward.  When circuit authority is overruled by the Supreme

25  Court, a district court is no longer bound by that authority, and need not wait until the authority is
   also expressly overruled.  See Miller v. Gammie, 335 F.3d 889, 899-900 (9th Cir. 2003) (en

26  banc).  Furthermore, "circuit precedent, authoritative at the time it was issued, can be effectively
   overruled by subsequent Supreme Court decisions that 'are closely on point,' even though those

6

> When, however, a State creates a liberty interest, the Due Process Clause requires fair procedures for its vindication-and federal courts will review the application of those constitutionally required procedures. In the context of parole, we have held that the procedures required are minimal.

Swarthout v. Cooke, at 862.

Citing Greenholtz,[5] the Supreme Court noted it had found under another state's similar parole statute that a prisoner had "received adequate process" when "allowed an opportunity to be heard" and "provided a statement of the reasons why parole was denied." Swarthout v. Cooke, at 862.  Noting their holding therein that "[t]he Constitution [] does not require more," the justices in the instances before them, found the prisoners had "received at least this amount of process: They were allowed to speak at their parole hearings and to contest the evidence against them, were afforded access to their records in advance, and were notified as to the reasons why parole was denied." Id.

The Supreme Court was emphatic in asserting "[t]hat should have been the beginning and the end of the federal habeas courts' inquiry...." Swarthout v. Cooke, at 862.  "It will not do to pronounce California's 'some evidence' rule to be 'a component' of the liberty interest...." Id., at 863.  "No opinion of ours supports converting California's "some evidence" rule into a substantive federal requirement." Id., at 862.  Thus, federal courts are precluded from review of the state court's application of its "some evidence" standard.  Claim 2 is essentially based entirely on alleged violations of California's "some evidence" requirement.

The copy of the transcript of BPH initial parole consideration hearing at issue in this action demonstrates that petitioner was amply "allowed an opportunity to be heard" at the hearing and was undisputely "provided a statement of the reasons why parole was denied."

___

decisions do not expressly overrule the prior circuit precedent." Miller, 335 F.3d at 899 (quoting Galbraith v. County of Santa Clara, 307 F.3d 1119, 1123 (9th Cir. 2002)).  Therefore, this court is not bound by Hayward.

[5] Greenholtz v. Inmates of Neb. Penal and Correctional Complex, 442 U.S. 1, 16 (1979).

1   <u>Swarthout</u>, at 862; <u>see</u> Answer, Exhibit 3(a) (docket # 29-4), pp. 56-127[6] through Ex. 3(b) pp. 2-

2   42.

3          According to the Supreme Court, the Constitution does not require more than his

4   having been provided an opportunity to be heard and provided a statement of reasons for the

5   parole denial, which the record unequivocally demonstrates that he received.  Claim 2 should be

6   denied.

7                  <u>State Law Claims – Claims 3, 4, & 6</u>

8          Claims 3, 4 and 6 are claims predicated on alleged violations of state law.  A writ

9   of habeas corpus is available under 28 U.S.C. § 2254(a) only on the basis of some transgression

10  of federal law binding on the state courts.  <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir.

11  1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is unavailable for alleged

12  error in the interpretation or application of state law.  <u>Middleton v. Cupp</u>, 768 F.2d at 1085; <u>see</u>

13  <u>also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786 F.2d 1378,

14  1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de novo.  <u>Milton v.</u>

15  <u>Wainwright</u>, 407 U.S. 371, 377, 92 S. Ct. 2174, 2178 (1972).

16         The Supreme Court has reiterated the standards of review for a federal habeas

17  court.  <u>Estelle v. McGuire</u>, 502 U.S. 62, 112 S. Ct. 475 (1991).  In <u>Estelle v. McGuire</u>, the

18  Supreme Court reversed the decision of the Court of Appeals for the Ninth Circuit, which had

19  granted federal habeas relief.  The Court held that the Ninth Circuit erred in concluding that the

20  evidence was incorrectly admitted under state law since, "it is not the province of a federal

21  habeas court to reexamine state court determinations on state law questions." <u>Id.</u> at 67-68, 112 S.

22  Ct. at 480.  The Court re-emphasized that "federal habeas corpus relief does not lie for error in

23  state law." <u>Id.</u> at 67, 112 S. Ct. at 480, citing <u>Lewis v. Jeffers</u>, 497 U.S. 764, 110 S. Ct. 3092,

24  3102 (1990), and <u>Pulley v. Harris</u>, 465 U.S. 37, 41, 104 S. Ct. 871, 874-75 (1984) (federal courts

25

26         [6] The court's electronic pagination is referenced.

8

1    may not grant habeas relief where the sole ground presented involves a perceived error of state

2    law, unless said error is so egregious as to amount to a violation of the Due Process or Equal

3    Protection clauses of the Fourteenth Amendment).

4              The Supreme Court further noted that the standard of review for a federal habeas

5    court "is limited to deciding whether a conviction violated the Constitution, laws, or treaties of

6    the United States (citations omitted)." Id. at 68, 112 S. Ct. at 480.  The Court also stated that in

7    order for error in the state trial proceedings to reach the level of a due process violation, the error

8    had to be one involving "fundamental fairness," Id. at 73, 112 S. Ct. at 482, and that "we 'have

9    defined the category of infractions that violate "fundamental fairness" very narrowly.'" Id. at 73,

10   112 S. Ct. at 482.  Habeas review does not lie in a claim that the state court erroneously allowed

11   or excluded particular evidence according to state evidentiary rules.  Jammal v. Van de Kamp,

12   926 F.2d 918, 919 (9th Cir. 1991).  As more recently re-emphasized by the Supreme Court, "'a

13   mere error of state law ... is not a denial of due process.'" Rivera v. Illinois, 556 U.S. 148, 129 S.

14   Ct. 1446, 1454 (2009) (quoting Engle v. Isaac, 456 107, 121, n. 21, 102 S. Ct. 1558 [] (1982)).

15                              *Claim 3*

16             Petitioner contends that the BPH's "pretextual assertion that petitioner has not yet

17   been adequately rehabilitated violates state law establishing the purpose of incarceration."

18   Petition, p. 37.  He argues that any "agency-created regulations, policies, or other interpretations

19   of statutory authority" the BPH has applied to demonstrate suitability "are invalid and

20   unenforceable because they violate the express legislative intent underlying the Determinate

21   Sentencing Law." Id.  Petitioner contends that the legislative intent underlying the codification

22   of the DSL included a recognition that "the concept of 'rehabilitation' was invalid," and that all

23   felony offense sentences were to "reflect culpability and to provide uniformity of punishment."

24   Id.  Petitioner states that demands that he undergo therapy and other forms of rehabilitation

25   (which he avers are unavailable anyway) ignored the statement in Cal. Pen. Code §1170(a)(1),

26   \\\\\

which sets forth "that the purpose of incarceration is punishment."[7]  Petition, p. 37.  Petitioner

also claims that recent CDCR[8] proclamations setting rehabilitation as a priority "would violate

the ex post facto doctrine of state law and the United States Constitution."  Id.  Petitioner alleges

that the BPH violated his state and federal right to due process by continuing his custody on the

basis that he was not sufficiently rehabilitated, as the legislature has found the concept of

rehabilitation to be "archaic" and "disproven."  Id.  Petitioner does not pinpoint specific areas

within the BPH transcript that he faults, asserting only that the BPH made "vague demands for

additional 'rehabilitation'" and that to do so was "illicit" in light of the state legislature's intent.

Id., at 37-38.  Petitioner elaborates at some length on what he believes to be the legislative intent

in the 1977 enactment of the DSL and maintains that the BPH has violated "the express

legislative intent and authority of the DSL" to the extent that it has denied him parole on the

basis of a lack of rehabilitation.  Id., at 37-40.

          Petitioner's claim that the BPH's alleged reliance on rehabilitation is in violation

of the theory underlying California's Determinate Sentencing Law is not one that is cognizable in

this federal habeas corpus action.  Rivera, 556 U.S. 148, 129 S.Ct. at 1454 ("a mere error of state

law ... is not a denial of due process").  In his supplemental briefing, petitioner, apparently

perceiving in response to respondent apparently perceiving that claims regarding state law

violations do not constitute a ground for a federal habeas petition (see Answer, p.7, and

respondent's supplemental briefing (RSB), p. 2), argues that his claim is that his Fourteenth

Amendment procedural due process rights were violated by the liberty interest that he contends

the state laws or regulations give rise to and that the state court's failure to hold an evidentiary

hearing on his claims requires this court to do so.  Petitioner's Supplemental Briefing (PSB)

---

[7] Petitioner actually maintains that the statement contained in Cal. Pen. Code § 1170(a)(1)
is "the purpose of incarceration is punishment, not rehabilitation," but the reference to
rehabilitation is not therein included.

[8] California Department of Corrections and Rehabilitation.

10

1   (docket # 40), p. 3.   To the extent that petitioner seeks to implicate the parole denial as a federal

2   due process violation because the BPH panel urged petitioner to engage in prison self-help

3   programs and to make an effort to improve his institutional behavior (noting that petitioner had

4   received 23 115's and 33 128's),[9] this claim must also be rejected.   As set forth above, the United

5   States Supreme Court has recently held that under the federal due process clause petitioner is

6   entitled only to an opportunity to be heard and a statement of the reasons for the denial of parole.

7   Because petitioner had his opportunity to be heard and received a statement of reasons for the

8   denial of parole, the decision did not violate his right to due process.

9           Petitioner's claim that the application of any post-DSL requirement that

10  petitioner show some form of rehabilitation before being released on parole is an ex post facto

11  violation is wholly without merit.   Simply because Cal. Pen. Code § 1170(a)(1) states that the

12  purpose of determinate sentencing is punishment does not foreclose the CDCR from requiring an

13  inmate to show some evidence of his rehabilitation before being released on parole.   The current

14  suitability criteria for parole are set forth in CAL. CODE REGS. tit.xv, § 2402(d) for murders

15  committed on or after November 8, 1978, and the offense, murder of his grandfather, for which

16  petitioner was convicted in 1990, occurred on October 16, 1983.   Answer, Ex. 1(b) docket # 29-

17  2, p. 48.   Among those factors indicating that a petitioner is unsuitable for parole is that he "has

18  engaged in serious misconduct in prison or jail" and a factor showing suitability includes that his

19  institutional behavior includes activities that "indicate an enhanced ability to function within the

20  law upon release." § 2402(c)(6) & (d)(9).   Petitioner at his hearing did not deny an extensive

21  record of institutional misconduct (see below).   To be an ex post facto violation at a minimum

22  would require that criteria applied to him post-dated the date of his commitment offense which

23  petitioner has not shown.   "The Constitution's  Ex Post Facto Clause prevents the government

24  _____

25      [9] See Answer, Ex. 3(b) (docket # 29-5), pp. 35-39.  In closing, Deputy Commissioner
    Smith stated: "You have to show the next panel that you can do the minimal that's expected of
26  you, which is to obey the rules in the institution.  You've got a long way to go." Id., at 41.

1   from retroactively altering the definition of, or increasing the punishment for, a crime.

2   <u>California Dept. of Corrections v. Morales</u>, 514 U.S. 499, 504-05 (1995) (citing <u>Collins v.</u>

3   <u>Youngblood</u>, 497 U.S. 37, 41 (1990).)"   <u>Sesma v. Hernandez</u>, 2007 WL 3243853 * 6 (S.D. Cal.

4   2007).   Accordingly, petitioner is not entitled to federal habeas relief on this claim.

5                                        *Claim 4*

6           In his fourth claim, petitioner contends that the BPH violated state law by failing

7   "to set a primary term ... - a duty mandated by state law that is entirely separate from its task of

8   determining current parole suitability" at his 2007 initial parole consideration hearing.   Petition,

9   p. 41.   The gravamen of this claim is that petitioner, sentenced under the DSL, is entitled to a

10   primary term-setting date separately from any date for parole suitability as occurred under the

11   preceding Indeterminate Sentencing Law (ISL).   <u>Id.</u>, at 41-49.   Petitioner claims that he is entitled

12   to the setting of a primary term, because under the newer DSL, none of the due process

13   protections provided by the ISLwere revised or repealed and it would somehow be a due process

14   and/or ex post facto violation not to apply to petitioner, a life prisoner with possibility of parole,

15   the ISL practice of setting a primary term commensurate with his commitment offense, separate

16   and apart from any finding that a prisoner is suitable for parole.   <u>Id.</u>   Petitioner does not frame an

17   ex post facto claim when he, properly sentenced under a later law, the DSL, claims to be entitled

18   to the provisions of an earlier statute because an ex post facto claim could only arise if one could

19   legitimately claim that a new law with more onerous provisions was being imposed upon one

20   who had been convicted or sentenced under an older, less onerous law.

21          Petitioner takes issue with state court decisions that have determined that the

22   transition from the regulations of the ISL to those of DSL did not impose more onerous

23   suitability guidelines and therefore did not implicate ex post facto issues.   Petition, referencing <u>In</u>

24   <u>re Duarte</u>, 143 Cal. App.3d 946, 193 Cal. Rptr. 176 (1983), and <u>In re Seabock</u>, 140 Cal. App.3d

25   29, 40, 189 Cal. Rptr. 310 (1983).   Petition, pp. 44-45.   Petitioner relies primarily on <u>In re</u>

26   <u>Stanworth</u> , 33 Cal. 3d 176, 187 Cal. Rptr. 783 (1982), which determined that an inmate found

suitable for parole in 1979 was entitled to parole consideration under both ISL and

DSLguidelines and the earlier release date of the two applications because the change from ISL

to DSL did invoke ex post facto principles.  However, <u>Stanworth</u>, unlike the issue raised by

petitioner,"dealt ... with the setting of parole release dates (i.e., fixing his term of imprisonment)

*after the inmate had already been found suitable for parole.*  <u>Sesma</u>, 2007 WL 3243853 * 5

[emphasis in original], citing <u>Stanworth</u>, 33 Cal.3d at 178-179).  California's parole guidelines

require the setting of a "base term for each life prisoner who is found suitable for parole." CAL.

CODE REGS. tit.xv, § 2403(a).  The "base term" is "established by utilizing the appropriate matrix

of base terms" provided in CAL. CODE REGS. tit.xv, §§ 2403, 2403(a).  Petitioner, in not yet having

been found suitable for release on parole, has not met the "prerequisite for the determination of a

'base term' and the calculation of a parole date." <u>Murphy v. Espinoza</u>, 401 F.Supp.2d 1048,

1055 (C.D. Cal. 2005); <u>see also</u> <u>Irons v. Carey</u>, 505 F.3d 846, 851 n. 3 (9th Cir. 2007) (A

"'determination of an individual inmate's suitability for parole under section 3041, subdivision

(b) must precede any effort to set a parole release date under the uniform-term principles of

section 3041, subdivision (a)'") (quoting <u>In re Dannenberg</u>, 34 Cal.4th 1061, 1079-80, 23

Cal.Rptr.3d 417, 104 P.3d 783 (2005)); Cal. Pen. Code § 3041(b) (The BPH "shall set a release

date unless it determines that the gravity of the current convicted offense or offenses, or the

timing and gravity of current past convicted offense or offenses, is such that consideration of the

public safety requires a more lengthy period of incarceration for this individual, and that a parole

date, therefore, cannot be fixed at this meeting"); CAL. CODE REGS. tit.xv, § 2402(a) (The BPH

"shall first determine whether the life prisoner is suitable for release on parole.  Regardless of the

length of time served, a life prisoner shall be found unsuitable for and denied parole if in the

judgment of the [BPH] the prisoner will pose an unreasonable risk of danger to society if released

from prison.").  "In other words, absent a determination of parole suitability by the [BPH], there

is no 'base term.'"  <u>Murphy</u>, 401 F.Supp.2d at 1055.  <u>See</u> <u>also</u> Cal. Pen. Code § 3041(b); CAL.

CODE REGS. tit.xv, § 2403(a).  Thus, petitioner's claim that the BPH erroneously failed to set a

primary or base term has no merit.  Moreover, petitioner's claim regarding application of the

Indeterminate Sentencing  Law is foreclosed by the decision in <u>Connor v. Estelle</u>, 981 F.2d 1032

(9th Cir.1992), wherein the Ninth Circuit held that application of the suitability criteria of the

DSL, rather than that of the ISL, does not violate due process, equal protection or the Ex Post

Facto Clause, because "[t]he ISL and DSL guidelines apply identical criteria in determining

parole suitability."  981 F.2d at 1034–35 (citing <u>In re Duarte</u>, 143 Cal.App.3d at 951, 193 Cal.

Rptr. 176).

This claim should be denied.

### *Claim 6*

Petitioner claims he is unlawfully being maintained in the state's custody because

he had passed his "Minimum Expected [sic] Parole Date" as of December 15, 2007.  Petition, p.

54.[10]  However, "the possibility of parole does not mean a guarantee of parole."  <u>Cook v. Carey</u>,

2008 WL 2523057* 9 (E.D. Cal. 2008).  "Under state law, the inmate must be found suitable

before his term and release date are set."  <u>Id.</u>  This claim should be denied.

### Claims of Bias – Claims 1, 5 and 7

Claims 1, 5 and 7 are essentially claims that petitioner was denied parole by a

biased adjudicator.  The Supreme Court has long recognized that "[a] fair trial in a fair tribunal is

a basic requirement of due process."  <u>In re Murchison</u>, 349 U.S. 133, 136, 75 S.Ct. 623 (1955);

<u>Withrow v. Larkin</u>, 421 U.S. 35, 46, 95 S.Ct. 1456 (1975); <u>Bracy v. Gramley</u>, 520 U.S. 899,

904–05, 117 S.Ct. 1793 (1997); <u>see also</u>, <u>Stivers v. Pierce</u>, 71 F.3d 732, 741 (9th Cir. 1995)

 "Fairness requires the absence of actual bias ... .and even the probability of unfairness."

<u>Murchison</u>, 349 U.S. at 136.  As noted by petitioner, the Supreme Court counts a 'neutral and

detached' hearing body as among the "minimum due process requirements" for a parole board.

---

[10] Confusingly, the BPH transcript indicates that his minimum eligible parole date
(MEPD) was December 15, 2008 (not 2007).  Answer, Ex. 3(a) (docket # 29-4), p. 58.  To cloud
the issue more, the computation on the CDCR documents appear to indicate petitioner's MEPD
was July 3, 2007.  <u>See</u>, Answer, Ex. 3(b), pp. 121-122.

1  Morrissey v. Brewer, 408 U.S. at  489, 92 S. Ct. 2593.  "Because parole board officials perform

2  tasks that are functionally comparable to those performed by the judiciary, they owe the same

3  duty: 'to render impartial decisions in cases and controversies that excite strong feelings because

4  the litigant's liberty is at state.'"  O'Bremski v. Maass, 915 F.2d 418, 422 (9th Cir. 1990).

5          In order to succeed on a biased parole board claim, petitioner "must overcome a

6  presumption of honesty and integrity in those serving as adjudicators...."  Withrow v. Larkin, 421

7  U.S. at 47, 95 S.Ct. 1456.  To attempt to frame a claim of unconstitutional bias, a plaintiff[11] must

8  show that the adjudicator "has prejudged, or reasonably appears to have prejudged, an issue."

9  Stivers v. Pierce, 71 F.3d at 741, quoting Kenneally v. Lungren, 967 F.2d 329, 333 (9th Cir.

10  1992) (quoting Partington v. Gedan, 880 F.2d 116, 135 (9th Cir. 1989) (Reinhardt, J. concurring

11  and dissenting)), cert. denied, 506 U.S. 1054, 113 S.Ct. 979 (1993).

12          Denial of the "constitutional right to a fair hearing before an impartial tribunal"

13  may be established in two ways:

14          In some cases, the proceedings and surrounding circumstances may
        demonstrate *actual bias* on the part of the adjudicator.  See Taylor
15      v. Hayes, 418 U.S. 488, 501-04, 94 S.Ct. 2697, 2704-06, 41
        L.Ed.2d 897 (1974);  Cinderella Career and Finishing Schools, Inc.
16      v. Federal Trade Comm'n, 425 F.2d 583, 591 (D.C.Cir.1970).   In
        other cases, the adjudicator's pecuniary or personal interest in the
17      outcome of the proceedings may create an *appearance of partiality*
        that violates due process, even without any showing of actual bias.
18      Gibson, 411 U.S. at 578, 93 S.Ct. at 1697-98; see also Exxon Corp.
        v. Heinze, 32 F.3d 1399, 1403 (9th Cir.1994) ("the Constitution is
19      concerned not only with actual bias but also with 'the appearance
        of justice.'").

20

21  Stivers v. Pierce, 71 F.3d at 741 [Emphasis in original].

22          Because the California Supreme Court's denial was a summary one,[12] the court

23  must look through to the last reasoned decision, in this instance, the denial by the state Court of

24  _____

25      [11] Or, in this case, petitioner.

26      [12]  Answer, Ex. 6 (docket # 29-9).

15

Appeal. When reviewing a state court's summary denial of a claim, the court "looks through" the

summary disposition to the last reasoned decision.  Shackleford v. Hubbard, 234 F.3d 1072, 1079

n. 2 (9th Cir. 2000), citing Ylst v. Nunnemaker, 501 U.S. 797, 803-04, 111 S. Ct. 2590 (1991).

The Second Appellate District set forth, in total, the following in denying

petitioner's habeas corpus petition:

> The petition for writ of habeas corpus filed on January 20, 2009,
> has been read and considered and is denied.  The August 2007
> decision of the Board of Parole Hearings is supported by some
> evidence under the clarified standard articulated in In re Lawrence,
> 44 Cal. 4th 1181 and applied in In re Shaputis (2008) 44 Ca.4th
> 1241, including the callous and heinous nature of the commitment
> offense, its trivial motive, petitioner's prior criminal history, his
> institutional behavior, psychological factors, and his lack of
> realistic parole plans.  (Cal. Code Regs., tit. 15, § 2402, subds. (c),
> (d).)

Answer, Ex. 4 (docket # 29-6).

The state court decision does not appear to have addressed the question of bias.  In

this instance, therefore, the court must engage in a *de novo* review with regard to the bias claims.

James v. Ryan, ___ F.3d ___, 2012 WL 639292 *18-19 (no AEDPA deference for decision of state

courts where the merits of the federal issue have not been adjudicated; instead, the issue is

reviewed *de novo* under general principles of federal law).  The court must address these claims

individually because an inference of bias, for example, could be drawn from evidence of multiple

clear errors in a record.  However, the review of the undersigned reveals that not only is there no

accumulation of egregious error, there is simply no error of any significance to give rise to even a

suspicion of bias.

### *Claim 1*

Petitioner's first claim, which contains seven parts or subclaims, alleges a

"partisan bias" on the part of BPH which, he asserts, is "readily apparent from the record" of the

hearing and which violated petitioner's constitutional right to due process and equal protection.

Petition, pp. 7, 9-20.  Petitioner predicates his claim of bias or partisanship by the BPH in part on

the hearing's having allegedly been held one day sooner than scheduled with no notice to
petitioner or his attorney, thus improperly excluding "favorable and substantial testimony certain
witnesses could and would have provided."  Petition, pp. 7, 10.  He also contends that the BPH
claimed falsely that, as a pretext to exclude his witnesses, they could not appear unless they had
been cleared through BPH headquarter's security.  Id., at 11-12.  The following exchange with
regard to these specific claims (or subclaims) took place at the hearing:

> **Inmate Scott**: Okay.  Can I just make one comment that I expected
> my family, the victim's family to
> attend.  There were some members
> from back east and my mother and
> brother, but the hearing is a day
> early, so they're not going to attend
> today.
> **Presiding Commissioner Shelton**: Well, let me put it this way to
> you, we called and verified what you said, and nobody has - -
> **Inmate Scott**: Nobody knew.  When I told my counselor I
> expected them to come, he said okay.
> **Presiding Commissioner Shelton**: Well, they can't come without
> permission.
> **Inmate Scott**: Nobody told me.  And I mentioned it to my
> attorney.
> **Presiding Commissioner Shelton**: He told us.  That's how we
> know, so we verified.
> **Inmate Scott**: But I didn't know.  I would have told them, hey, you
> got to go get it approved in advance.
> **Presiding Commissioner Shelton**: That's what counselors are all
> about.
> **Inmate Scott**: Nobody told me, and so - -
> **Presiding Commissioner Shelton**: Well, you didn't ask, and next
> time you need to because you just can't invite people.
> **Inmate Scott**: I understand that concept, but I would think that if a
> counselor is counseling an inmate on his first parole hearing, and
> he says, 'Well, I expect the victim's family to come and make
> statements on my behalf,' he might say, 'Well, are they approved?
> He might question that, and he didn't, and so, be that as it may,
> that's the way it sits.
> **Presiding Commissioner Shelton**: We have something that is
> called notices and responses.
> **Inmate Scott**: I didn't get any paperwork regarding what my rights
> were at that hearing.
> **Presiding Commissioner Shelton**: You didn't.  You know, maybe
> you need to not interrupt me and let me finish - -
> **Inmate Scott**: I apologize,
> **Presiding Commissioner Shelton**: - - and then you'll understand
> what I'm saying.  And usually, notices are responses are [sic] sent

17

1   out to those people.  They're called 3042 notices, and they're sent
2   out to those people that would have an interest in your case,
    individuals and agencies, and usually the District Attorney's
    offices in different agencies as well, some do, some don't, handle
3   dealing with victims.  So, just for future reference, yours is a
    particularly different type of case in that the victim in your case
4   was a relative, and - -
    **Inmate Scott**: My grandfather.
5   **Presiding Commissioner Shelton**: And the people that were
    talking about coming to visit are also relative, so that all has to be
6   cleared for security purposes, and I think you've probably been in
    custody long enough to know that anybody that comes into prison
7   needs to be cleared.
    **Inmate Scott**: Well, actually, most of the individuals are cleared
8   already.  They've been on my visiting, you know, approval sheet
    any ways.
9   **Presiding Commissioner Shelton**: Good.  But that's not the same
    kind of approval for hearings.
10  **Inmate Scott**: Yeah, like I said, I had no idea and neither did my
    family.
11  **Presiding Commissioner Shelton**: Do you understand now?
    **Inmate Scott**: Now I understand, a day late and a dollar short.
12  **Presiding Commissioner Shelton**: All right.  They wouldn't have
    been allowed to come in tomorrow even if we had your hearing
13  tomorrow.
    **Inmate Scott**: But they would have been able to attend if they were
14  approved?
    **Presiding Commissioner Shelton**: Ahead of time, and then it goes
15  through headquarters.
    **Inmate Scott**: Okay.
16  **Presiding Commissioner Shelton**: All right.  We got that cleared
    up in case you have an additional hearing, then you're covered.  All
17  right.  Good.  Now, we'll move on.  . . .

18  Answer, Ex.3(a) (docket # 29-4), pp. 68-71.

19          Petitioner claims that each of his intended witnesses would have provided

20  information that was "relevant, reliable and material" and would have described for the BPH that

21  he did not present a current threat to public safety, how they would assist him in his parole, why

22  he was suitable for release.  Petition, p. 11.  Petitioner lists some seven individuals, identified as

23  relatives of the victim (and, therefore, obviously, petitioner's relatives as well); he includes, as

24  well two more individuals he identifies as business acquaintances and three others he names as

25  personal friends.  Id.  Although petitioner states that he has attached declarations by Esther

26  Braverman (whose name, confusingly, is not included among plaintiff's lists of potential

18

1   witnesses) and Debra Scott, listed as a relative of the victim, no such declarations are attached

2   with his petition.  Nor does petitioner contend that he has obtained supportive declarations from

3   any of the other eleven people he has set forth as willing to provide attestations of support for his

4   parole.  However, the court's review of the hearing transcript reveals that a signed and notarized

5   supportive letter to the parole board, dated March 31, 1997, declaring her belief in petitioner's

6   innocence was attached from Esther Braverman (apparently petitioner's great-aunt and the

7   victim's sister), as well as a signed letter from Debra Scott (petitioner's mother and the victim's

8   daughter) to the BPH declaring her son's innocence of the murder and dated May 19, 2007.

9   Answer, Ex. 3(b) (docket # 29-5), pp. 44-45, 47-48.  There is also a July 12, 2007 letter from

10  petitioner's trial counsel stating that he and petitioner declined an offer to plead to a voluntary

11  manslaughter charge as they believed in petitioner's innocence.  Id., at 50.  There are also

12  supportive letters from individuals named Kenny Ortega and Pamela Stonebrook.  Id., at 54-56.

13  At the hearing, Presiding Commissioner Shelton noted the letters of support from Ms. Braverman

14  and petitioner's mother (and their belief in his innocence of the commitment offense), but also

15  observed that there was no letter of support from petitioner's brother regarding employment or

16  housing.  Id., at 2-3 & Ex. 3(a) (docket # 29-4) at 127.  Also acknowledged on the record were

17  the letters of support from Pamela Stonebrook and Kenny Ortega and from petitioner's defense

18  counsel and one from an Irving Adland and another from an Aaron Russo, as well as a

19  declaration from a Donald Thomas.  Id., at 4-6 & Ex. 3(a) (docket # 29-4) at 126-127.

20          Petitioner has not shown bias against him by the BPH panel with respect to not

21  having been permitted the witnesses he sought as his claim that the security clearances referenced

22  are not required is insubstantial.  As to his claim of bias by not being allowed witnesses because

23  the hearing took place a day early, that is similarly without basis when the record shows the one

24  day would have made no difference to his having obtained the in-person witness testimony he

25  sought.  To the extent that he seeks to implicate due process by his having been deprived of

26  witnesses, the Supreme Court, as noted above, has made clear in the parole context that the

1 procedures required to satisfy federal due process "are minimal" and are met when petitioner –

2 as he indisputably has in this instance – has been "allowed an opportunity to be heard" and

3 "provided a statement of the reasons why parole was denied." <u>Swarthout v. Cooke</u>, 131 S. Ct. at

4 862.  Moreover, his witnesses were heard through the documentary support for petitioner's

5 release.

6        Petitioner next claims that bias was shown when the BPH allowed the district

7 attorney to question him directly at the hearing in violation of state law, which law he asserts,

8 creates an enforceable federal due process liberty interest.  Petition, p. 12.  Petitioner refers

9 generally to the participation of a district attorney as being governed by CAL. CODE REGS. tit.xv, §

10 2000 et seq., asserting that questions from a D.A. are to be directed to the BPH members who in

11 turn will direct the inmate to respond as though to the BPH.  Petition, p. 12. CAL. CODE REGS. tit.xv,

12 § 2030 is entitled "Prosecutor Participation."  Under § 2030(a)(1), a "representative of the office

13 which prosecuted a prisoner" may "participate in any board hearing when the prisoner ... is

14 represented by an attorney."  Pursuant to § 2030(a)(3), "[a] representative of the district attorney

15 of the county from which a life prisoner was committed may participate in any parole

16 consideration or rescission hearing for that prisoner."  Under CAL. CODE REGS. tit.xv, § 2030(d)(2),

17 "[t]he role of the prosecutor is to comment on the facts of the case and present an opinion about

18 the appropriate disposition.  In making comments, supporting documentation in the file should be

19 cited.  The prosecutor may be permitted to ask clarifying questions of the hearing panel, but may

20 not render legal advice."

21        Petitioner was represented by counsel at the hearing.  Ans., Ex. 3(a) (docket # 29-

22 4), p. 59.  Petitioner maintains that the BPH abdicated its responsibility to "enforce the

23 mandatory state protocol" by permitting the D.A.'s representative to, in essence, conduct a

24 portion of the hearing and interrogate petitioner for a length of time covering four pages of the

25 hearing transcript.  Petition, p. 13.  Petitioner asserts that this occurred after the presiding

26 commissioner demonstrated awareness of the appropriate procedure before abandoning it.  <u>Id.</u>

1   The transcript indicates that the presiding commissioner asked the deputy district attorney

2   (Wynn) if he had questions:

3               **Presiding Commissioner Shelton**: Okay.  Mr. Wynn, do you have
                any questions, and before you do, I need to let Mr. Scott know that
4               this is not a courtroom setting - -
                **Inmate Scott**: Okay.
5               **Presiding Commissioner Shelton**: And it's not confrontational, so
                Mr. Wynn will ask - - will direction [sic] his questions to us, and
6               you will direct your answers to us.
                **Inmate Scott**: Okay.
7               **Presiding Commissioner Shelton**: It's just kind of like a protocol
                that is really awkward, but we're stuck with it.  Go ahead, Mr.
8               Wynn.

9   Answer, Ex. 3(b) (docket # 29-5), p. 11.

10              There follows, as petitioner avers, a series of questions directed to

11  petitioner by the D.D.A., which indeed in being directed to petitioner in the second person

12  ("you"), without any intercession by the BPH, does not appear to have been strictly in line with

13  the protocol the presiding commissioner had herself set forth.  Although the format of the

14  questioning (or, as petitioner would have it, "interrogat[ion]"), apparently not objected to by

15  either petitioner or his counsel at the time, does not appear to have been conducted with strict

16  adherence to the arguably awkward procedure, petitioner nevertheless does not demonstrate how

17  it shows the BPH's bias or how the lack of strict adherence to the protocol implicated his right to

18  due process.

19              Petitioner next asserts that the BPH showed bias "in violation of federal

20  constitutional authority and express mandatory state law" by having "improperly deemed

21  petitioner's consistent assertion of actual innocence [to be] proof of his unsuitability for parole."

22  Petition, p. 13.  Citing In re Dannenberg, 34 Cal. 4th 1061, 1099, 23 Cal. Rptr.3d 417 (2005),

23  petitioner contends that the California State Supreme Court has acknowledged that Cal. Pen.

24  Code § 5011(b)[13] "expressly prohibits" the BPH from "basing an inference of unsuitability for

25

26          [13]  "The Board of Prison Terms shall not require, when setting parole dates, an admission
        of guilt to any crime for which an inmate was committed."  Cal. Pen. Code § 5011(b).

                                              21

1  parole on an applicant's assertion of actual innocence." Id.   However, that is not what the state

2  Supreme Court therein stated.  Rather, the court essentially passed on the issue:

3          We need not consider the technical validity of Dannenberg's
           argument, for we conclude that any error by the Board in this
4          respect was harmless. It appears manifest that the Board's reference
           to Dannenberg's failure to take responsibility was peripheral to its
5          decision and did not affect the outcome.

6  Dannenberg, 34 Cal.4th at 1099.

7          The record of the hearing, however, does not support petitioner's contention that

8  the BPH panel found him unsuitable for parole based on his assertion of actual innocence.  The

9  transcript shows that at several points, the BPH panel was careful both to protect petitioner's

10  rights when it came to discussing or not discussing the commitment offense, while also making

11  clear that they accepted the trial court's findings.

12          **Presiding Commissioner Shelton**: ... Now, the purpose of today's
           hearing is to discuss your suitability for parole.  We're not here to
13          retry your case.  You've been found guilty.  So, we are going to
           concentrate on factors dealing with your issues of suitability for
14          parole.  To do that, we take a look at your commitment offense.
           We take a look at your prior record.  We look at your social
15          history, and Commissioner Smith will be talking with you about
           what you've been doing since you've been incarcerated and that
16          includes psychiatric evaluations, et cetera.

17  Answer, Ex. 3(a) (docket # 29-4, pp. 62-63.

18          **Presiding Commissioner Shelton**: ...Like I said, nothing that
           happens today will change the findings of the court.  We are not
19          here to retry your case.
           **Inmate Scott**: I understand.
20
   Id., at 64.
21
           **Presiding Commissioner Shelton**: ... Mr. Scott, you are not
22          required to admit to or to discuss your offense.  Do you understand
           that part?
23          **Inmate Scott**: Yes, I do.
           **Presiding Commissioner Shelton**: Tell me what this means to you
24          when I say this Panel accepts as true the findings of the court.
           **Inmate Scott**: It means what you said, that you accept the finding
25          of guilt by a jury of my peers.
           **Presiding Commissioner Shelton**: And we're not here to retry
26          your case.

1    **Inmate Scott**: Not here to retry my case, and I understand that.

2  Id., at 67-68.

3    Petitioner's counsel[14] made clear that petitioner would not be discussing the life

4  crime but that petitioner did accept the findings and orders of the court.  Id., at 72-73.  When

5  petitioner thereafter asserted that he would not mind discussing what he knew about the events at

6  his trial, the following exchange occurred:

7          **Presiding Commissioner Shelton**: Okay.  We need to make
           something very clear.  You either will or wouldn't discuss the
8          commitment offense, so your attorney says that you're in an
           appeals process with matters in court?
9          **Inmate Scott:** Yes, I am.  That does not necessarily mean that I
           would not discuss it.  I guess I'll just go with what he suggests and
10         leave it at that.
           **Presiding Commissioner Shelton**: That might be a good idea.
11         That's why you have an attorney.

12  Id., at 73.

13    It is true that, in recounting reasons for the parole denial, reference was made to

14  to petitioner's commitment offense:

15         **Presiding Commissioner Shelton:** ... and as far as I'm concerned,
           there's no doubt in my mind that you are guilty of this offense, and
16         the sooner you deal with it and real life, the sooner things might go
           better in your direction.

17  Answer, Ex. 3(b) (docket # 29-5), p. 34.
18
           **Presiding Commissioner Shelton:** ... In a separate decision, this
19         hearing Panel finds that Mr. Scott has been convicted of murder,
           and it is not reasonable to expect that parole would be granted as a
20         hearing during the next five years.  This includes the commitment
21  offense for [sic] which we have discussed. We understand you deny it. We don't believe you.
    Neither does a jury.  You need to come to terms with that.
22
23  Answer, Ex. 3(b) (docket # 29-5), p. 39.

24  \\\\\

25  ─────────────────────
       [14] In the transcript, this statement is incorrectly attributed to petitioner, but it is evident
26  that petitioner's counsel was speaking to this issue.

                                        23

1    However, there is no showing that petitioner was required to admit his guilt and,

2    even had he done so, that there would have been any change in the outcome.  For example, the

3    record shows that petitioner admitted that he had a significant record of prison

4    disciplinary findings:

5    **Deputy Commissioner Smith**:... This is your initial hearing.  You
     have a classification score of 45, and quite candidly, you have one

6    of the worst disciplinary histories that I have seen in a long time.
     **Inmate Scott**: Yeah, I know.

7    **Deputy Commissioner Smith**: And I sit on a lot of hearings.
     **Inmate Scott**: Yeah, I'm aware of that.  I'm not happy with it.

8    Answer, Ex. 3(a) (docket # 29-4), pp. 100-101.

9    Later, petitioner admitted:

10

11   **Inmate Scott**: No.  I can't argue with you.  I have a rotten disciplinary record.

12   Id., at 108.

13   Still later, when asked by the deputy district attorney whether he had "been getting

14   115's on purpose," petitioner stated: "Have I?  Yes and no."  Answer, Ex. 3(b) (docket # 29-5), p.

15   15.

16   In any case, this claim appears to fall more within the frame of a "some evidence"

17   claim from which review, on a substantive basis, this court is foreclosed.  Swarthout v. Cooke,

18   ___ U.S. ___, 131 S. Ct. at 861.  This claim should be denied.

19                                           *Claim 5*

20   Petitioner contends that his due process and equal protection rights were violated

21   because BPH followed a "no parole" policy, averring that the denial decision must be vacated.

22   Petition, p. 50.  In this instance, petitioner has essentially alleged a claim of systemic, rather

23   than personal, bias on the part of the BPH commissioners based on an alleged policy or practice

24   of nearly wholesale denial of parole at initial parole hearings, notwithstanding the requirements

25   of a state statutory and regulatory scheme, in violation of his federal right to due process.  Calling

26   such allegations "conclusory and apparently erroneous," earlier cases have found the claim of a

1 | "no parole" policy at initial hearings does not state a claim for habeas relief.  See, e.g., Ochoa v.

2 | Marshall, 2009 WL 86563 * 8 (C.D. Cal. 2009), citing Lancaster v. Bd. of Prison Terms, 234

3 | Fed. App'x. 588, at *1 (9th Cir. June 13, 2007) ("conclusory allegations" that BPH denied parole

4 | based on an alleged "no parole" policy "cannot provide a basis for habeas relief"); Jones v.

5 | Gomez, 66 F.3d 199, 204-05 (9th Cir.1995), cert. denied, 517 U.S. 1143, 116 S.Ct. 1437 (1996)

6 | ("conclusory allegations ... not supported by a statement of specific facts do not warrant habeas

7 | relief").  In Ochoa, the Central District court noted:

> [D]uring the time Petitioner apparently contends that this "no
> parole" policy has been in force, the United States District Court
> for the Eastern District of California twice has observed that the
> Board has granted parole at several initial parole hearings. See Otte
> v. Mendoza-Powers, 2008 WL 351798, at *7 (E.D.Cal. Feb.6,
> 2008), adopted, 2008 WL 880565 (E.D.Cal. Mar.31, 2008);
> Morton v. Mendoza-Powers, 2007 WL 2688850, at *7 (E.D.Cal.
> Sept.13, 2007), adopted, 2008 WL 217498 (E.D.Cal. Jan.25,
> 2008).

13 | Id.

14 | It is true that Judge Karlton found that Governors Wilson and Davis

15 | exhibited bias with a "no parole" policy.  Coleman v. BPT, 2005 WL 4629202 (E.D. Cal. 2005).

16 | However, neither Pete Wilson nor Gray Davis was the Governor of California in

17 | 2007 when petitioner's suitability hearing took place, and petitioner has offered no evidence

18 | suggesting that the BPH was operating under a no-parole policy for life prisoners after Governor

19 | Davis left office.  Rather, petitioner's hearing took place under the gubernatorial tenure of Arnold

20 | Schwarzenegger, and, as the Ninth Circuit stated, in the appeal of Coleman v. BPT, in an

21 | unpublished opinion, "the record is bereft of any evidence that the Schwarzenegger

22 | administration instituted a 'no parole for murderers' policy."  Coleman, 228 Fed. Appx. 673,

23 | 675, 2007 WL 1073774 * 2 (9th Cir. 2007)(unpublished).[15]  Therefore, petitioner is not entitled

---

[15] Although not selected for publication, the Ninth Circuit has permitted citation to
unpublished cases since 2007.  Ninth Circuit Rule 36-3, in accordance with Fed. R. App. P. 32.1,
permits citation to unpublished dispositions and orders issued on or after January 1, 2007.
However, such rulings "are not precedent, except when relevant under the doctrine of law of the

to relief on this claim.

*Claim 7*

In this claim, petitioner simply states that Linda Shelton, who was the presiding commissioner on his BPH hearing panel was fired for bias. Petition, p. 55. Petitioner provides nothing beyond this abrupt statement and respondent does not specifically address it. The undersigned can locate no confirmation of this assertion, nor is it evident in the record, and, as it is petitioner's burden to produce any supporting evidence, the relevance of this claim, if true, cannot be evaluated. This insufficiently supported claim should be denied.

Claim 8 – Challenge to State Court Decisions

Finally, petitioner makes a generic claim argues that the state courts' decisions, i.e., the denials of his state court habeas petitions challenging the denial of parole at his 2007 initial parole consideration hearing, as "'contrary to, or [having] involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court," and "[having been] based on an unreasonable determination of the facts." However, this court has found that petitioner has raised no grounds that show the state courts' determination affirming the denial of parole to be an unreasonable application of clearly established federal law as determined by the Supreme Court. This claim should be denied.

Accordingly, IT IS HEREBY RECOMMENDED that the petition be denied.

If petitioner files objections, he shall also address if a certificate of appealability should issue and, if so, as to which issues. A certificate of appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). The certificate of appealability must "indicate which specific issue or issues satisfy" the requirement. 28 U.S.C. § 2253(c)(3).

\\\\\

_____

case or rules of claim preclusion or issue preclusion." Ninth Circuit Rule 36-3(a).

1   These findings and recommendations are submitted to the United States District

2   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

3   days after being served with these findings and recommendations, any party may file written

4   objections with the court and serve a copy on all parties.  Such a document should be captioned

5    "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

6   shall be served and filed within fourteen days after service of the objections.  The parties are

7   advised that failure to file objections within the specified time may waive the right to appeal the

8   District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

9   DATED: March 13, 2012


10                                          /s/ Gregory G. Hollows
11                                   UNITED STATES MAGISTRATE JUDGE

12
    GGH:009
13  scot2830.prl

14

15

16

17

18

19

20

21

22

23

24

25

26

27